UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROMAN KITROSER,

                      Plaintiff,

          -v.-

UNITED STATES OF AMERICA,

                    Defendant.

17 Civ. 4142 (KPF)
15 Cr. 19 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Roman Kitroser brings this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. In November 2015, Kitroser pleaded guilty to one count of conspiracy to distribute and to possess with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, for which he was sentenced principally to a term of 25 years' imprisonment by this Court. In his § 2255 motion, Kitroser argues that his prior counsel rendered ineffective assistance by failing to investigate whether certain evidence that emerged after Kitroser's guilty plea could have supported a post-plea motion to suppress part or all of the Government's evidence against him. Because Kitroser has failed to show that: (i) such an investigation would have led to a meritorious suppression motion, or (ii) he was prejudiced by his counsel's failure to make such a motion, his § 2255 motion is denied.

A.    **Factual Background**

1.    **The Commencement of the Investigation in 2012**

The DEA began investigating Roman Kitroser in 2012 for suspected narcotics trafficking.  (PSR ¶ 12).  On July 11, 2012, Natisha Aponte, who had been identified as Kitroser's girlfriend, was stopped by law enforcement authorities at John F. Kennedy International Airport while carrying $136,900 in cash in a vacuum-sealed pouch contained within her carry-on luggage.  (*Id.* at ¶ 13).  Law enforcement officers seized the cash, and on July 16, 2012, a narcotics-detecting canine alerted officers to the presence of narcotics with the money.  (*Id.*).  Due to the fact that the investigation was ongoing, Aponte was not arrested at that time.  (*Id.*).

2.    **The Continuation of the Investigation in 2013**

In December 2013, employees of a car dealership in Brooklyn notified local law enforcement authorities that they had received a package they believed to contain drugs.  (PSR ¶ 14).  Upon arrival, agents opened the package and discovered approximately three kilograms of heroin.  (*Id.*).  They directed the employees of the dealership to alert them if and when someone arrived to pick up the package.  (*Id.*).  Later that day, Aponte arrived at the car

---

[1]    All docket entries in this Opinion refer to the docket for *United States* v. *Roman Kitroser*, No. 15 Cr. 19 (KPF).  For ease of reference, the Court refers to the parties' briefing as follows: Kitroser's memorandum supporting his motion is referred to as "Kitroser Br." (Dkt. #140); the Government's memorandum in opposition as "Gov't Opp." (Dkt. #143); and Kitroser's reply as "Kitroser Reply" (Dkt. #148).  In addition, the Court refers to Kitroser's Presentence Investigation Report, which is maintained in a restricted format at docket entry #133, as "PSR."

dealership to pick up the package. (*Id.*). However, she became suspicious of the employees' efforts to stall her and left without the package. (*Id.*). Aponte was then observed entering a vehicle that Kitroser was driving. Again, Aponte was stopped by law enforcement authorities — this time with Kitroser — and again she was permitted to leave. (*Id.*).

### 3. Kitroser's Arrest in Late 2014

The investigation into Kitroser's narcotics-trafficking activities continued into 2014. On approximately 20 different dates between November 2014 and December 2014, DEA agents conducted surveillance of Kitroser in the vicinities of his Brooklyn and Manhattan apartments. (PSR ¶ 16). On November 12, 2014, agents videotaped Kitroser at a Duane Reade pharmacy near his Manhattan apartment, engaging in a drug transaction with two unidentified individuals. (*Id.* at ¶ 17).

On November 20, 2014, agents observed Kitroser attempt to mail a large package; a canine later alerted agents to the detection of narcotics in the package. (PSR ¶ 18). That same day, agents obtained a search warrant for the package (the "November 2014 Warrant"), signed by then-United States Magistrate Judge Ronald L. Ellis of this District; in executing the warrant, agents recovered a speaker with a hidden compartment that contained approximately $300,000 in cash. (*Id.*). An employee at the mail station where Kitroser had attempted to mail the package told DEA agents that he knew Kitroser as "John Mackley," and, further, that Kitroser was a regular customer who had sent 15 packages during the preceding 90 days. (*Id.* at ¶ 19).

Four days later, on November 24, 2014, Kitroser was intercepted on a wiretap that was being administered in California by the DEA (the "California Wiretap"), and that was intended to intercept the communications of members of a drug-trafficking organization responsible for importing large quantities of narcotics into the U.S. from Mexico. (PSR ¶ 20). In connection with that investigation, the DEA had seized at least 403 pounds of cocaine, 230 pounds of heroin, and 28 pounds of methamphetamine between May 12, 2014, and October 28, 2014. (*Id.*). Kitroser was heard speaking with one of the targets of the California investigation, who was receiving shipments of narcotics in the Los Angeles area. (*Id.*). Kitroser engaged in multiple telephone calls with the target, during which they discussed, among other things, the receipt and transport of various packages and boxes. (*Id.*).

On December 4, 2014, the Government obtained a warrant for Kitroser's geolocation information from then-United States Magistrate Judge Frank Maas of this District. (Dkt. #140-6). The agent affidavit in support of the warrant recited that there was probable cause to believe that the geolocation information would lead to evidence of a narcotics conspiracy given the following facts: (i) the DEA had been investigating Kitroser since 2012; (ii) an individual had told law enforcement that on at least three occasions he had received packages of cash from Kitroser for narcotics trafficking; (iii) law enforcement had observed Kitroser attempt to mail a package that contained $500,000 in cash in a speaker; (iv) a canine had alerted officers to the presence of controlled substances in the package; (v) Kitroser had mailed 15 packages to California in

the preceding 90 days using the name "John Mackley"; (vi) law enforcement agents in California had observed a target of the California Wiretap investigation pick up the packages shipped by Kitroser; (vii) that target had been intercepted participating in several calls with Kitroser; and (viii) the DEA now had recordings of the calls between Kitroser and the target discussing mailing packages. (*Id.* at 4-7).

That same day, the Government obtained a warrant for a GPS tracking device for two of Kitroser's vehicles from United States Magistrate Judge Roanne Mann of the Eastern District of New York. (Dkt. #140-7). The agent affidavit in support of this warrant recited that there was probable cause to believe that GPS information would lead to evidence of a narcotics conspiracy given the following facts: (i) an individual had told law enforcement that on at least three occasions he had received packages of cash from Kitroser for narcotics trafficking; (ii) law enforcement had observed Kitroser trade bags with two men in the back of a drug store in Manhattan; (iii) Kitroser had attempted to mail a package that contained $500,000 in cash in a speaker from a Brooklyn mail station; (iv) a canine had alerted to the presence of controlled substances in the package; (v) Kitroser had mailed 15 packages to California from the Brooklyn mail station in the preceding 90 days using the name "John Mackley"; and (vi) law enforcement agents in California had observed a target of the California Wiretap investigation pick up certain packages shipped by Kitroser. (*Id.* at 4-9).

5

On December 8, 2014, law enforcement agents identified a package arriving from California that was intended for Kitroser. (PSR ¶ 22). After obtaining a positive canine hit on the package and a search warrant, law enforcement agents opened the package and discovered a speaker that contained one kilogram of heroin and six kilograms of cocaine. (*Id.*). On December 9, 2014, law enforcement agents observed what they believed to be a drug transaction between Kitroser and another individual in the parking lot of a Staples store in Brooklyn. (*Id.* at ¶ 23).

On December 11, 2014, law enforcement agents again conducted surveillance of Kitroser in the vicinity of his Brooklyn apartment. (PSR ¶ 25). Kitroser was observed entering the residence and emerging with a bookbag, which he put in the trunk of his car. (*Id.*). Kitroser drove a short distance, at which point co-defendant Ronel Pierre approached Kitroser's car carrying a black bag. (*Id.*). Pierre entered the vehicle and handed the bag to Kitroser. (*Id.*). Law enforcement agents approached the car and spoke with Kitroser and Pierre. (*Id.*). Kitroser claimed that the car was not his and that the bags inside did not belong to him. (*Id.*). Kitroser and Pierre were then arrested. (*Id.*). Law enforcement agents subsequently found $67,995 in the bag delivered by Pierre and two packages containing two kilograms of cocaine inside the bookbag carried by Kitroser. (*Id.*).

That day, Kitroser was arrested in this District along with Natisha Aponte, Ronel Pierre, and Jessy Castillo. (Dkt. #3). Also on that day, United States Magistrate Judge Vera Scanlon of the Eastern District of New York

signed a search warrant for Kitroser's Brooklyn apartment.  (PSR ¶ 27).  The agent affidavit submitted in support of the warrant recited that there was probable cause to believe that Kitroser kept narcotics and narcotics proceeds in the apartment given the following facts: (i) Kitroser had attempted to mail a package that contained $300,000[2] in cash in a speaker; (ii) a canine had alerted officers to the presence of controlled substances in the package; and (iii) law enforcement officers had arrested Kitroser with two bookbags in his car, one containing large bundles of U.S. currency and another containing two brick-shaped packages containing what appeared to be cocaine.  (Dkt. #143-2 at 3-5).

In executing the search warrant for Kitroser's Brooklyn apartment, DEA agents found, among other things, nine firearms, one of which showed evidence of discharge and three of which appeared to be three machine-guns; two silencers; high-ammunition magazines; approximately eight kilogram-sized packages containing cocaine; two packages containing approximately two kilograms of heroin; a large press used to form loose narcotics into kilogram-sized bricks (i.e., a "kilo press"); bundles of U.S. currency totaling more than $889,000; three money counters; approximately 21 cell phones; a laptop computer that revealed that more than 140 UPS packages had been tracked

---

[2]     Specifically, the agent averred that "[u]pon execution of that search warrant, I and other law enforcement agents discovered approximately $500,000 in cash hidden inside of a speaker, which was, in turn, contained within the Box."  (Dkt. #143-2 at 3).  The number "500,000" is crossed out and there is a handwritten mark above it stating "300,000."  (*Id.*).  The references to $500,000 in the GPS and geolocation warrant applications appear to have been made in error.

between California and New York, each of which weighed between nine and 60 pounds; and identification cards that displayed photographs of Kitroser, but reflected different names. (PSR ¶ 27).

The following day, December 12, 2014, United States Magistrate Judge Gabriel W. Gorenstein of this District signed a search warrant for Kitroser's Manhattan apartment. (PSR ¶ 29). The agent affidavit submitted in support of the warrant recited that there was probable cause to believe that Kitroser kept narcotics and narcotics proceeds in that apartment given the following facts: (i) Kitroser had been seen driving between and among his Manhattan apartment, his Brooklyn apartment, and a mail station with cardboard boxes; (ii) law enforcement officers had stopped Kitroser with two bookbags in his car, one of which contained large bundles of U.S. currency and the other of which contained two brick-shaped packages of what appeared to be cocaine; and (iii) a search of Kitroser's Brooklyn apartment had turned up six kilograms of cocaine, receipts from UPS and FedEx stores, a kilo press, U.S. currency, and guns. (Dkt. #143-4 at 3-6).

During the execution of the search warrant at Kitroser's Manhattan apartment, agents found, among other items, three speaker boxes, each containing seven kilograms of cocaine (for a total of 21 kilograms); a bag containing 2.35 kilograms of marijuana; scales; a safe containing approximately $55,000 in U.S. currency; a vacuum-sealed package containing more than $100,000 in U.S. currency; ledgers containing tracking numbers for packages; three money counters; electronics; and fake identification cards.

(PSR ¶ 29).  Using a key recovered during the execution of the residential search warrants, law enforcement agents then opened a storage locker in Brooklyn.  (*Id.* at ¶ 30).  Inside the locker, agents recovered a Louis Vuitton purse that contained two hand grenades hidden inside two red cloth bags. (*Id.*).

On December 18, 2014, DEA agents executed a search warrant on 10 parcels intercepted in connection with the investigation.  (PSR ¶ 31).  The parcels were addressed to various companies and individuals in New York City and were sent from various individuals in California.  (*Id.*).  The packages were determined to contain approximately 35 kilograms of cocaine, three kilograms of heroin, and $1,001,265 in cash.  (*Id.*).

## B.    Procedural Background

### 1.    The Complaint and the Indictment

On December 12, 2014, the day after the arrests, the Government filed Complaint No. 14 Mag. 2797, charging Kitroser, Aponte, Pierre, and Castillo with conspiring to distribute and to possess with the intent to distribute controlled substances (specifically, cocaine, heroin, and marijuana), in violation of 21 U.S.C. § 846, and with using and carrying, or aiding and abetting the use and possession of, firearms in connection with that conspiracy, in violation of 18 U.S.C. §§ 924(c) and 2.  (Dkt. #1).  Kitroser was represented at his presentment by attorney James R. Froccaro, Esq.; attorneys Edward Palermo and Sanford Talkin later entered notices of appearance, but the conduct about which Kitroser now complains was undertaken by Froccaro.  (Dkt. #2, 13, 17).

On January 13, 2015, a grand jury returned Indictment No. 15 Cr. 19, charging Kitroser and his co-defendants with: (i) conspiring to distribute and to possess with the intent to distribute controlled substances (specifically, cocaine, heroin, and marijuana), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and (D), and 846; and (ii) possession of a firearm during and in relation to a drug trafficking crime, and aiding and abetting same, in violation of 18 U.S.C. §§ 924(c) and 2. (Dkt. #14). Kitroser was arraigned on January 16, 2015, and subsequent pretrial conferences were held with him on March 13, 2015, and April 3, 2015. (Minute Entries).

### 2.    The Motion to Suppress and the Scheduling of Trial

On July 16, 2015, Kitroser submitted a motion to suppress any evidence seized pursuant to the November 2014 Warrant, as well as the fruits of any such evidence. (Dkt. #61). Kitroser argued that the warrant was based on a purported canine alert that narcotics would be found inside the cardboard box, but that after the warrant was issued and the search of the package conducted, no controlled substances were found. (*Id.* at 6-7). After briefing had concluded, and shortly before oral argument, Kitroser submitted a "supplement" to his motion that raised additional factual and legal arguments. (Dkt. #77). On October 16, 2015, the Court held oral argument on Kitroser's motion as supplemented. (Dkt. #83 (transcript of proceedings)). The Court then denied the suppression motion via oral order. (*Id.* at 58:21-59:3).

On October 21, 2015, the Government filed a prior felony information against Kitroser pursuant to 21 U.S.C. § 851, which filing had the effect of

doubling the otherwise-applicable mandatory minimum terms specified by 21 U.S.C. § 841(b)(1)(A). (Dkt. #79). The following day, the Court issued a schedule for trial to begin on December 1, 2015. (Dkt. #80).

### 3. The Plea and Sentencing

On November 2, 2015, Kitroser pleaded guilty pursuant to a plea agreement with the Government to Count One of the Indictment, which charged him with conspiracy to distribute and to possess with the intent to distribute one kilogram and more of mixtures and substances containing a detectable amount of heroin, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, and mixtures and substances containing a detectable amount of marijuana. (*See* Dkt. #83). The Government and Kitroser stipulated that, because of the weight of drugs involved, the use of a firearm, the maintenance of a stash house, the commission of the offense as part of a pattern of criminal conduct engaged in as a livelihood, and Kitroser's supervisory role in the charged conspiracy, the adjusted offense level under the Guidelines was 42. (Dkt. #140-2 ("Plea Agreement") at 2-3; *see also* PSR ¶¶ 43-50). The Government agreed that a two-level decrease would be appropriate if Kitroser continued to accept responsibility, and that it would recommend a reduction of one additional level for Kitroser's provision of timely notice of his intention to plead guilty, for an adjusted offense level of 39. (Plea Agreement 3; *see also* PSR ¶¶ 52-53). With a Criminal History Category of III, Kitroser's stipulated Guidelines range was 324 to 405 months' imprisonment, with a mandatory minimum term of 240

months' imprisonment.  (Plea Agreement 3-4; Dkt. #136 at 33:3-15).  Of

potential significance to the instant motion, the Government agreed to move to

dismiss Count Two of the Indictment and agreed not to pursue further criminal

prosecution of Kitroser for "conspiring to distribute and possess with intent to

distribute cocaine, heroin, and marijuana from in or about December 2013

through on or about December 12, 2014."  (Plea Agreement 1, 2).

   At his plea allocution, Kitroser confirmed that he had discussed the

charges in the Indictment with his attorney and that he understood the

consequences of his plea.  (Dkt. #87 (transcript of proceedings)).  The Court

informed Kitroser that the maximum term of imprisonment for a guilty plea to

Count One of the Indictment was lifetime imprisonment and that the

mandatory minimum term was 20 years.  (*Id.* at 18:22-19:4).  Kitroser stated

that he understood the sentencing process and still wanted to enter a guilty

plea.  (*Id.* at 21).

   A few weeks after Kitroser entered his guilty plea, in November and

December 2015, *USA Today* ran a series of articles under the heading

"America's Wiretap Capital," which articles contained information regarding the

Riverside County, California wiretap program.  (*See* Dkt. #140-1).  In relevant

part, the series detailed how Riverside County District Attorney Paul Zellerbach

had delegated authority — impermissibly, it was argued — to lower-level

lawyers within his office to review wiretap applications.  (*See id.*).  The articles

also discussed the disparity between the number of wiretaps authorized in

Riverside County and those authorized in all other state and federal jurisdictions.

On June 6, 2016, the Court sentenced Kitroser principally to a term of 300 months' imprisonment, which reflected a below-Guidelines sentence. (Dkt. #136). In imposing sentence, the Court observed:

> What is useful in this process is hearing from those who know Mr. Kitroser outside of the criminal justice system. The letter from his son, the letter from his friend, Mr. Meringolo, the letter from his family members. Also in the probation report I see some evidence of legitimate employment.
>
> And then we have the countervailing factors. There is an awful lot of narcotics here. I will put the grenades to the side because I don't know really what to do with them. The guns and the silencers were significant enough. The sheer amount of narcotics proceeds dwarfs any case I've had as a judge. And when you look at things that folks say [may][3] be accurate predictors or proxies for culpability, they are all here. There is a prior conviction, there is substantial jail time on narcotics charges, which itself … was the product of a four-year involvement in a narcotics conspiracy, and where there was criminal conduct while on pretrial release.

(*Id.* at 34:1-16). Neither Kitroser nor the Government appealed from the sentence.[4]

On June 2, 2017, Kitroser, represented by new counsel, filed a motion pursuant to 28 U.S.C. § 2255 to vacate his conviction on the grounds that his

---

[3] The transcript reflects "may not," but the Court is confident that it said "may," particularly given the remainder of the paragraph.

[4] Kitroser's Plea Agreement with the Government contained a waiver of his right to appeal or collaterally challenge any sentence of imprisonment within or below the parties' stipulated Guidelines range. (Dkt. #87 at 26:6-16). There was, however, a carveout to that waiver for claims of ineffective assistance of counsel.

prior counsel had been ineffective in failing to investigate the Riverside County information. (Dkt. #140). The Government filed a brief in opposition on July 26, 2017. (Dkt. #143). On September 24, 2017, Kitroser filed a brief and affidavit in reply to the Government's opposition. (Dkt. #148, 149).

## DISCUSSION

### A. Applicable Law

#### 1. Motions Under § 2255

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). However, the grounds for such a collateral attack under Section 2255 are much more limited than those available on a direct appeal. *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979). Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

Generally speaking, a § 2255 motion requires a hearing unless files and records conclusively show that the prisoner is entitled to no relief. *See* 28 U.S.C. § 2255(b); *see also Machibroda* v. *United States*, 368 U.S. 487, 494

(1962); *Pham* v. *United States*, 317 F.3d 178, 184 (2d Cir. 2003). No hearing is required, however, where the movant's allegations are "vague, conclusory, or palpably incredible." *Machibroda*, 368 U.S. at 495. To warrant a hearing, the movant "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Gonzalez* v. *United States*, 722 F.3d 118, 131 (2d Cir. 2013). Significantly, however, a district court retains discretion when determining whether to hold a hearing, and may elect to investigate facts outside the record without the personal presence of the movant. *See Machibroda*, 368 U.S. at 495; *see also, e.g.*, *Chang* v. *United States*, 250 F.3d 79, 85-86 (2d Cir. 2001).

### 2. Ineffectiveness Claims on Collateral Review

One potential basis for relief under § 2255 occurs when a defendant has received the ineffective assistance of counsel. A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings; this includes entry of a guilty plea, *see, e.g., Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985), and sentencing, *see, e.g., Glover* v. *United States*, 531 U.S. 198, 202-04 (2001).

In order to succeed on a claim of ineffective assistance of counsel, a movant must meet the two-pronged test established by *Strickland* v. *Washington*, 466 U.S. 668 (1984). First, the movant must show that his counsel's representation was deficient, falling below the objective standard of reasonableness. *See id.* at 687-88. During this first step, the standard of

review is highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The Second Circuit has made clear that an attorney does not provide ineffective assistance by failing to raise frivolous arguments, even where requested by a client. *See, e.g., Weingarten* v. *United States*, 865 F.3d 48, 53 (2d Cir. 2017).

Next, the movant must establish that his counsel's errors resulted in actual prejudice. *See Strickland*, 466 U.S. at 694. A movant satisfies this second prong by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* In the specific context of guilty pleas, the prejudice analysis "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

A court is not required to conduct a *Strickland* inquiry in any particular order. *See Strickland*, 466 U.S. at 697. If the defendant does not successfully establish either the performance prong *or* the prejudice prong, the entire claim fails, and the remaining, unaddressed step becomes moot. *See id.*

### 3.     Post-Plea Motions to Suppress

In order to make a showing of ineffective assistance of counsel based on the failure to make a suppression motion, the putative motion must be shown

to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed. *See United States* v. *Matos*, 905 F.2d 30, 32 (2d Cir. 1990); *Kimmelman* v. *Morrison*, 477 U.S. 365, 375 (1986); *accord United States* v. *Tisdale*, 195 F.3d 70, 71 (2d Cir. 1999).

Kitroser acknowledges that the information on which his § 2255 motion is based became known only after his guilty plea. Under Federal Rule of Criminal Procedure 11, Kitroser would therefore have had to show "a fair and just reason for requesting the withdrawal" of the plea. Fed. R. Crim. P. 11(d). In addition, under Federal Rule of Criminal Procedure 12, Kitroser would have had to show "good cause" for failing to file a timely suppression motion. Fed. R. Crim. P. 12(b)(3), (c)(3). The Court considers Kitroser's arguments with these standards in mind.

**B.    Kitroser's Prior Counsel Did Not Render Ineffective Assistance**

### 1.    The Putative Suppression Motion Would Not Have Been Meritorious

In his motion, Kitroser asserts that the California Wiretap was illegal and, more importantly, that prior counsel James Froccaro was ineffective in failing to investigate the Wiretap for two separate reasons: (i) investigation would have resulted in a meritorious suppression motion and a basis to withdraw Kitroser's guilty plea, and (ii) investigation would have revealed that the prosecutors in this case and the California case omitted material information from several warrant applications, in violation of *Franks* v. *Delaware*, 438 U.S. 154 (1978), which would have provided a separate basis for

withdrawal of the guilty plea.  As set forth in the remainder of this Opinion, these arguments lack merit.

### 1. Kitroser Has Not Demonstrated a Basis to Suppress the California Wiretap or Its Fruits

#### a. Motions to Suppress Under Title III

Kitroser relies heavily on California law to support his ineffectiveness arguments.  However, the law is clear that the admissibility of wiretap evidence in a federal prosecution is properly evaluated using federal standards.  *See United States* v. *Miller*, 116 F.3d 641, 661 (2d Cir. 1997).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, specifies the minimum requirements for obtaining judicial authorization to intercept wire, oral, or electronic communications. Generally speaking, Title III requires a wiretap applicant, upon oath or affirmation, *see id.* § 2518(1), to provide "full and complete statement[s]" both as to probable cause for such interceptions and as to the need to use such methods, *id.* § 2518(1)(b) and (c).  *See generally United States* v. *Lambus*, 897 F.3d 368, 393 (2d Cir. 2018).

Title III contains its own exclusionary provision.  In particular, it permits an "aggrieved person" to move

> to suppress the contents of any wire or oral communication intercepted ... or evidence derived therefrom, on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).

Both constitutional and statutory violations may result in suppression under § 2518(10)(a)(i). *United States* v. *Giordano*, 416 U.S. 505, 527-28 (1974). That said, not "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States* v. *Chavez*, 416 U.S. 562, 574-75 (1974) (holding that misidentification of the official authorizing a wiretap application did not require suppression of wiretap evidence under § 2518(10)(a)(i) when the application was authorized by an appropriate official). Rather, "Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527.

Wiretap evidence must be suppressed when provisions that are "intended to play a central role in the statutory scheme" are violated. *Giordano*, 416 U.S. at 528; *accord United States* v. *Donovan*, 429 U.S. 413, 433-34 (1977). Conversely, "[a] technical defect ... is insufficient grounds to warrant suppression." *United States* v. *Garcia*, No. 04 Cr. 603 (HB), 2005 WL 589627, at *5 (S.D.N.Y. Mar. 14, 2005) (citing *United States* v. *Radcliff*, 331 F.3d 1153 (10th Cir. 2003)). "The thrust of *Giordano* and *Chavez* is that only the violation of a sufficiently important statutory provision will render an interception 'unlawful' under § 2518(10)(a)(i)." *United States* v. *Simels*, No. 08 Cr. 640 (JG),

19

2009 WL 1924746, at *10 (E.D.N.Y. July 2, 2009); *see also Lambus*, 897 F.3d at 395-96 (rejecting district court conclusion that defects in the wiretap application had to be "inadvertent"; reversing suppression of wiretaps based on failure to disclose prior authorizations).

### b.    Kitroser Has Not Identified a Basis for Suppression

Despite the fact that federal law governs any exclusionary analysis, Kitroser leans heavily into his argument that California law was violated, and that such violation merited suppression of the evidence against him. The Court need not conclude that the putative violation of California law discussed in this section would merit suppression under the federal standard. That is because Kitroser has fallen at the antecedent hurdle of demonstrating that the California Wiretap violated California law.

Kitroser's illegality argument is premised on the fact that the application for the wiretap (the "California Wiretap Application") was not signed by Paul Zellerbach, then the District Attorney of Riverside County, but by Assistant District Attorney Creg G. Datig. Kitroser argues that this delegation violated California Penal Code § 629.50, which requires the District Attorney to apply for all wiretap orders, unless an assistant district attorney has been designated to act as the district attorney in the District Attorney's absence.

In *United States* v. *Perez-Valencia*, 727 F.3d 852, 855 (9th Cir. 2013), the Ninth Circuit explained "that 'the' attorney designated to act in the district attorney's absence — as § 629.50 specifies — must be acting in the district attorney's absence not just as an assistant district attorney designated with the

limited authority to apply for a wiretap order, but as an assistant district attorney duly designated to act for *all* purposes as the district attorney of the political subdivision in question."  Ultimately, that Court remanded the matter to the district court for further development of the record regarding whether the assistant district attorney at issue was duly acting for all purposes as the principal prosecuting attorney of the county where the wiretap was authorized, because the district attorney's memo merely stated that certain assistants were designated "to act in [his] absence."  *Id.* at 854-55.[5]

Here, the very memo that Kitroser cites in support of his argument makes plain that Zellerbach *did* delegate his authority to Datig "to make all decisions necessary to the administration of the District Attorney's Office" in Zellerbach's absence.  (Dkt. #140-3).  This memo suffices to show that Datig was authorized not merely to apply for wiretap applications, but also to act with the full scope of authority of the District Attorney in Zellerbach's absence.  Thus, Zellerbach's delegation to Datig was not *per se* impermissible.

Recognizing as much, Kitroser argues that, because nothing in the California Wiretap indicates that Zellerbach was absent or otherwise unavailable on the day the California Wiretap was signed, the Court should infer that Zellerbach was present, and thus that Datig's signature on the California Wiretap Application is illegal.  (*See* Kitroser Br. 11 ("But nothing in

---

[5]    On remand, the district court concluded that the Assistant District Attorney who submitted the wiretap application was the only person authorized to do so and had authority to exercise all the powers of the office.  The resulting denial of the defendant's suppression motion was then upheld by the Ninth Circuit.  *See United States* v. *Perez-Valencia*, 744 F.3d 600, 603 (9th Cir. 2014).

the Nov. 2014 wiretap application indicates that Zellerbach was absent or otherwise unavailable of the day of submission.")). However, Kitroser's insinuation that Zellerbach was likely present on the day that Datig applied for the warrant is not enough to convince the Court that the wiretap was obtained illegally. *See Nardone* v. *United States*, 308 U.S. 338, 342 (1939) ("The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed."). Indeed, the affirmation of Deputy District Attorney Deena Bennett suggests that Datig *was* duly authorized to sign the California Wiretap Application. (Dkt. #140-4). While acknowledging that Zellerbach's contemporaneous records were inadequate to resolve the issue, Bennett convincingly explains why Zellerbach would not have been present — his recent election loss, which left him a proverbial "lame duck" through January 2015. (*Id.* at ¶¶ 2-3, 6; *see also id.* at ¶¶ 13-14 (explaining the geographical expanse of Riverside County and the constant physical location for the designated judicial officer)). On this record, the Court cannot conclude that there was a violation of § 629.50 or, by extension, that a meritorious suppression motion could have been made on this basis.

Other district courts have concluded similarly. In *United States* v. *Ruiz*, No. 09 Cr. 719 (DAB), 2010 WL 4840055, at *5 (S.D.N.Y. Nov. 19, 2010), the defendant who was recorded on a wiretap applied for by a subordinate of the Riverside County District Attorney, argued that without evidence of the District Attorney's absence, the subordinate's signature could not be accepted and

therefore the warrant application violated state law. A sister court in this District rejected this argument, noting that while the Government offered no proof that the District Attorney was absent, the defendant bore the burden to show that the warrant applicant abused his authority. *Id.* (citing *United States* v. *Terry*, 702 F.2d 299, 310-11 (2d Cir. 1983) (holding that a designated official is "presumed to have properly exercised" the power to apply for a wiretap "unless the defendants offer evidence, apart from mere conjecture or speculation, to rebut this presumption")). Similarly, the allegations in the *USA Today* series, while potentially troubling, do not show that Zellerbach was actually present and available on the date that Datig signed the California Wiretap. Nor would the series have provided Kitroser's prior counsel with the ability to obtain information on Zellerbach's whereabouts on the date in question.

In *United States* v. *Mattingly*, No. 15 Cr. 99 (DJH), 2016 WL 3670828, at *5 (W.D. Ky. July 1, 2016), a second court denied a suppression motion based on the same arguments made here. In *Mattingly*, the defendant argued that several wiretaps signed by assistant district attorneys in Riverside County, including one signed by Datig pursuant to delegation from Zellerbach, were illegal. *Id.* The defendant offered no evidence that Zellerbach was present when the wiretaps were authorized; instead, like Kitroser, he pointed to the *USA Today* articles, and urged the court to infer that Zellerbach had improperly designated his wiretap authority on a permanent basis. *Id.* at *6. The *Mattingly* court rejected this argument, concluding that the *USA Today* articles

did not show that Zellerbach was actually present and available on the dates of the wiretap applications at issue, or that his designation of authority under § 690.50 was otherwise unlawful. *Id.* The court also explained that "statistics regarding the total number of wiretaps applied for by the Riverside County DA's office in 2014 [did not] provide information relevant to this particular case." *Id.* Since it was Mattingly's burden to show that the wiretap application was invalid, and he offered only mere speculation that Zellerbach was in fact available, the court concluded that suppression was not warranted on the ground that the wiretaps were improperly authorized. *Id.* at *7.

Had Kitroser's counsel moved to suppress evidence obtained from the California Wiretap, he would have faced the same obstacles that Ruiz and Mattingly faced in proving that the District Attorney was not absent at the time that the warrants were approved. Given such obstacles, Kitroser's counsel would have been reasonable in concluding that it was not advisable for his client to attempt to file a suppression motion on this basis or to attempt to withdraw his plea.

### c. Kitroser Was Not Prejudiced by His Counsel's Failure to Make a Suppression Motion

Even if Kitroser's attorney could have shown that the California Wiretap was obtained illegally, he would have faced another obstacle in showing that the Government's trove of physical evidence against him — including large quantities of drugs, drug paraphernalia, cash, guns, and other weapons — was derived from that wiretap and should be suppressed. Since even a successful suppression motion would have suppressed little, if any, of the evidence

against Kitroser, his attorney did not provide ineffective assistance in failing to make such a motion, and Kitroser was not prejudiced by the failure to make such a motion.

The exclusionary rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served. *See United States* v. *Awadallah*, 349 F.3d 42, 72 (2d Cir. 2003). "Any extension of the rule beyond its core application — normally, barring use of the illegally seized items as affirmative evidence in the trial of the matter for which the search was conducted — must be justified by balancing the additional marginal deterrence of the extension against the cost to the public interest of further impairing the pursuit of truth." *Id.*; *cf. United States* v. *Ganias*, 824 F.3d 199, 209 (2d Cir. 2016) (en banc) (discussing good faith exception to Fourth Amendment exclusionary rule).

The fruit of the poisonous true doctrine requires the exclusion of the fruits of illegally obtained evidence, unless "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at ... by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963). This principle has resulted in considerable latitude in the application of the exclusionary rule in the Fourth Amendment context. Even where there has been misconduct on the part of law enforcement, the exclusionary rule allows the receipt of evidence that the Government inevitably would have discovered legally in any case, as

well as evidence that is sufficiently attenuated from the illegal government action. *See id.* at 487-88

Kitroser argues that all of the evidence obtained by the Government after the California Wiretap was issued on November 20, 2014, would have been suppressed as fruits of the poisonous tree. (Kitroser Br. 14-15). He is wrong. To begin, Kitroser was not picked up on the California Wiretap until November 24, 2014, and he would thus have been unable to demonstrate that evidence obtained by the Government before that date was tainted. By that time, the Government was two years into its investigation of Kitroser, and had amassed a significant amount of evidence. Among other things, the DEA had (i) observed Kitroser's girlfriend (who had earlier been stopped with $136,000 in cash at JFK) attempt to pick up a package containing three kilograms of heroin in his presence; (ii) observed Kitroser engage in a drug transaction at a Duane Reade pharmacy; (iii) observed Kitroser attempt to ship a package containing $300,000 hidden in a speaker; (iv) learned that Kitroser had been regularly shipping packages under a fake name; and (v) been in contact with a co-conspirator of Kitroser who told them specifically that Kitroser had sent him packages containing money from narcotics trafficking. (Gov't Opp., Ex. 1 at 3). Even if a suppression motion had been made, Kitroser would not have been able to show that the California Wiretap had any bearing on this evidence.

Further, Kitroser's arguments about why the evidence obtained after November 24, 2014, was tainted by the California Wiretap are unpersuasive. Kitroser claims, in conclusory fashion, that "because much of the proof against

26

Kitroser appears to derive, directly and indirectly, from the initial geolocation and GPS warrants there is 'reasonable probability' that the Court — upon proper motion — would have held it inadmissible fruit of the infirm Riverside tap, quashing the plea accordingly." (Kitroser Br. 15). On the contrary, there are several reasons why it is unlikely that the Court would have found all of the evidence post-dating the California Wiretap to have been inadmissible fruit.

Of note, neither the application for the GPS warrant nor the application for the geolocation warrant relies solely on evidence obtained through the California Wiretap to establish probable cause. Both warrant applications recite other evidence the Government had obtained on Kitroser long before he was intercepted on the California Wiretap. Thus, the result of suppressing the California Wiretap evidence would not have automatically resulted in suppression of the evidence derived from the GPS and geolocation warrants. Evidence is not excluded as fruit of the poisonous tree unless the illegality is at least the but-for cause of the discovery of the evidence. *Segura* v. *United States*, 468 U.S. 796, 815 (1984). Given all of the facts establishing probable cause in the warrant applications, it cannot be said that the evidence obtained from the California Warrant was the but-for cause of the discovery of evidence obtained from those warrants.

**2. Kitroser Was Not Prejudiced by Prior Counsel's Failure to Seek a *Franks* Hearing**

As a fallback position, Kitroser argues that investigation of the California Wiretap and its Application by his prior counsel would have allowed him to challenge that warrant, as well as the GPS and geolocation warrants, in a

hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978). In *Franks*, the

Supreme Court held that, despite the "presumption of validity with respect to

the affidavit supporting [a] search warrant," a defendant can challenge an

affidavit "where the defendant makes a substantial preliminary showing that a

false statement knowingly and intentionally, or with reckless disregard for the

truth, was included by the affiant in the warrant affidavit, and if the allegedly

false statement is necessary to the finding of probable cause." *Id.* at 155-56.

The Second Circuit has provided extensive guidance to district courts

conducting a *Franks* analysis in *United States* v. *Rajaratnam*, 719 F.3d 139 (2d

Cir. 2013), and for this reason, this Court quotes at length from that opinion:

> "[T]o suppress evidence obtained pursuant to an
> affidavit containing erroneous information, the
> defendant must show that: (1) the claimed inaccuracies
> or omissions are the result of the affiant's deliberate
> falsehood or reckless disregard for the truth; and (2) the
> alleged falsehoods or omissions were necessary to the
> [issuing] judge's probable cause [or necessity] finding."
> *United States* v. *Canfield*, 212 F.3d 713, 717-18 (2d Cir.
> 2000) (internal quotation marks omitted); *see also*
> *United States* v. *Awadallah*, 349 F.3d 42, 64 (2d Cir.
> 2003) (noting that "[i]n order to invoke the *Franks*
> doctrine, [a defendant] must show that there were
> *intentional* and *material* misrepresentations or
> omissions in [the] warrant affidavit." (emphases
> supplied)).
>
> To determine whether misstatements are "material," a
> court must "set[ ] aside the falsehoods" in the
> application, *United States* v. *Coreas*, 419 F.3d 151, 155
> (2d Cir. 2005), and determine "[w]hether the untainted
> portions [of the application] suffice to support a
> probable cause [or necessity] finding," *United States* v.
> *Nanni*, 59 F.3d 1425, 1433 (2d Cir. 1995). If the
> untainted portions of the application are sufficient to
> support the probable cause or necessity findings, then

28

the misstatements are not "material" and suppression is not required.

Although omissions "are governed by the same rules" as misstatements, *United States* v. *Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985), "the literal *Franks* approach [does not] seem[ ] adequate because, by their nature, omissions cannot be deleted"; therefore "[a] better approach ... would be to ... insert the omitted truths revealed at the suppression hearing," *United States* v. *Ippolito*, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985). Accordingly, we have held that "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause [or necessity]." *Canfield*, 212 F.3d at 718 (internal quotation marks omitted); *see also United States* v. *Martin*, 615 F.2d 318, 328 (5th Cir. 1980) ("[W]e [are] required to determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause [or necessity].... If it would not, we would be required to void the warrant and suppress the evidence seized pursuant to it.").

*Id.* at 146; *accord United States* v. *Long*, 678 F. App'x 31, 34 (2d Cir. 2017) (summary order), *as amended* (Feb. 3, 2017).

Kitroser argues that the *USA Today* series offers information sufficient to make a "substantial preliminary showing" that — even if the California Wiretap Application were compliant with the relevant law — the applicants for the California Wiretap Application, the geolocation warrant, and the GPS warrant strategically withheld two integral facts: (i) Zellerbach had abdicated his wiretap authority and (ii) he did so to shirk political responsibility for constitutional violations. (Kitroser Br. 16). But these are conclusory allegations, which do not suffice to prove, or even merit an evidentiary hearing,

as to the proffered facts.  The record before the Court, even with the inclusion of the *USA Today* series, offers no substantiation for either point.

Further, Kitroser's conclusory assertions do not show that the agents who applied for the three warrants knew, intended, or were even reckless in omitting the proffered information regarding Zellerbach.  Beginning with the California Wiretap, the Court observes a circularity to Kitroser's argument that a legally compliant wiretap application (which this Court finds the California Wiretap Application to be) would nonetheless be constitutionally or statutorily infirm for reciting that the District Attorney had delegated his authority as California law permits, while failing to recite that this delegation was an "abdication" of responsibility undertaken to "shirk" constitutional violations.  On this point, Kitroser's citations to the district court opinion in *Mattingly*, 2016 WL 3670828, at *5-6, are misleading, as they do not reflect the findings of the district court, but rather the findings of another court with a different factual record.

Turning next to the SDNY geolocation and GPS warrants, the relevant applications underscore the limits of the affiant's involvement in the California investigation, and the concomitant overreach of Kitroser's argument of joint investigation.  (*See* Kitroser Br. 16).  The DEA agent affiant, Anthony Scotto, relates only that he had discussions with law enforcement agents in California and obtained from them recordings and line sheets from telephone calls, including calls with a person Scotto believed to be Kitroser.  (*See* Dkt. #140-6 at 6-7; Dkt. #140-7 at 8).  The warrant applications do not indicate that Scotto

30

was aware of the circumstances surrounding the California agents' obtaining of the California Wiretap, and the *USA Today* series, which might have put Scotto on notice, was not published until a year after all of these warrants were issued.

In any event, omission of the proffered information regarding Zellerbach would not have affected the judges' findings of probable cause. Using the standards identified by the Second Circuit, this Court can confidently conclude that "putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause." *Canfield*, 212 F.3d at 718. The California Wiretap Application was supported by a 63-page affidavit (Dkt. #140-5), in which the agent painstakingly detailed efforts undertaken in 2013 and 2014 to investigate a wide-ranging narcotics-trafficking conspiracy, including (i) law enforcement seizures of hundreds of pounds of controlled substances between May and October 2014; (ii) communications intercepted pursuant to other, unchallenged wiretap orders; (iii) the analysis of toll records; (iv) physical surveillance in 2013 and 2014, including surveillance of criminal activity in Riverside County; and (v) the execution of search warrants at locations associated with the target subjects of the application. Put simply, abundant evidence existed for the grant of the California Wiretap Application.

Information obtained from the California Wiretap was far less important to the findings of probable cause for the geolocation and GPS warrants in this District. These applications focused on evidence of Kitroser's criminal conduct

obtained well prior to Kitroser's interception on the California Wiretap,
including evidence that: (i) the DEA had been investigating Kitroser since 2012;
(ii) an individual had told law enforcement that on at least three occasions he
had received packages from Kitroser containing narcotics proceeds; (iii) law
enforcement had observed Kitroser attempt to mail a package that contained
$300,000 in cash in a speaker; (iv) a canine had alerted officers to the presence
of controlled substances in the package; and (v) Kitroser had mailed 15
packages in the preceding 90 days using the name "John Mackley." (Dkt.
#140-6 at 4-6). That evidence alone suffices to establishes probable cause that
Kitroser was involved in narcotics trafficking, and would support the issuance
of each of the warrants. *See United States* v. *Martin*, 426 F.3d 68, 76 (2d Cir.
2005) (stating that probable cause is a common-sense test; an affidavit in
support of a search warrant need only establish that there is a fair probability
that contraband or evidence of a crime will be found in a particular place).

The evidence that the Government obtained from the search of Kitroser's
apartments is even further attenuated from the California Wiretap, inasmuch
as it was obtained pursuant to search warrants that made *no* mention of the
California Wiretap. The Magistrate Judges who signed the search warrants for
Kitroser's Manhattan and Brooklyn apartments found probable cause to believe
that Kitroser was involved in narcotics distribution from the other evidence
obtained during the agents' two-year investigation. And the results of those
residential search warrants included machine guns, grenades, silencers, tens

of kilograms of cocaine, kilograms of heroin, kilograms of marijuana, and U.S. currency totaling over $1 million.  (PSR ¶¶ 27-30).

For all of these reasons, whether couched as a violation of Title III or of *Franks*, Kitroser could not have made a meritorious suppression motion had his prior counsel investigated the substance of the *USA Today* series. Therefore, Kitroser was not prejudiced by his counsel's failure to investigate or to make a motion to suppress or to withdraw his plea, and his counsel's representation did not constitute ineffective assistance.

## C.    **Kitroser Would Not Have Obtained a More Favorable Result by Withdrawing His Plea**

To review, a movant raising a claim of ineffectiveness under § 2255 who has been convicted based on a plea of guilty is typically required to aver that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.  Kitroser does not do that, but rather avers that had he known that the Government's evidence against him resulted from an improperly obtained wiretap warrant, he would have instructed his prior counsel attorney to move to withdraw his plea and seek suppression of the wiretap evidence and its fruits.  (Dkt. #148-1 at ¶ 9).

The Court has reviewed with great care Kitroser's factual and legal contentions.  As explained in the preceding section, the Court is confident that there was no meritorious suppression motion to be made on the record presented to it here.  Given that fact, there is little chance that Kitroser would have fared well at a trial that would have included intercepted communications, video surveillance, a cooperating witness, and a surfeit of

physical evidence. Conversely, given this backdrop, prior counsel obtained for

Kitroser a favorable plea offer — one that foreclosed the possibility of a

mandatory consecutive term of at least five years' imprisonment under 18

U.S.C. § 924(c)(1), prevented the Government from filing a superseding

charging instrument that would have referenced the hand grenades (which

would have prompted a higher mandatory consecutive term), and allowed

Kitroser both a three-level reduction for acceptance of responsibility and the

ability to argue for (and receive) a below-Guidelines sentence. There is no

reasonable probability that had Kitroser withdrawn his guilty plea and pursued

a motion to suppress the California Wiretap, he would have received a result

more favorable than the below-Guidelines sentence that resulted from his plea

deal. Kitroser's counsel was not ineffective in realizing that this was the case

and in refraining to take an action (withdrawal of the plea) which would very

likely have resulted in a materially worse outcome for Kitroser.

## CONCLUSION

In connection with this motion, this Court received a private letter from

Roman Kitroser, building upon themes discussed at his sentencing and

providing information concerning both the lessons he has learned as a result of

this prosecution and his abiding hope that his young son chooses a different

path. The undersigned is gratified to receive the letter, and was deeply moved

by its contents.

The fact remains that Kitroser has not identified a basis to vacate his

prior conviction or sentence. The arguments he now makes studiously avoid

reference to the two years' worth of investigative efforts undertaken independently of the California Wiretap. Separately, however much Kitroser has grown while incarcerated, the fact remains that his involvement in narcotics trafficking was more widespread, and carried greater risks to co-conspirators and to the public, than any other narcotics defendant the Court has sentenced. The Court's below-Guidelines sentence adequately balanced the danger (from both the narcotics and the weapons) caused by Kitroser and the possibility of his reform. The Court sees no basis in the law to disturb that sentence.

Kitroser's motion under 28 U.S.C. § 2255 is DENIED. A certificate of appealability shall be not granted, because Kitroser has not made a substantial showing of a denial of a federal right and appellate review is, therefore, not warranted. *Hoffler* v. *Bezio*, 726 F.3d 144, 154 (2d Cir. 2013); *Tankleff* v. *Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998).

The Clerk of Court directed to terminate all pending motions, adjourn all remaining dates and close this case.

SO ORDERED.

Dated:     October 22, 2019
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge